# APRIL TERM, 1878.

---

EMELINE E. PIERCE ET AL. v. LOREN PIERCE ET AL.

*Admission of evidence—Verdict under duress—Sealed verdicts—Testamentary incapacity—Intoxication—Wife's influence.*

Rulings on the admission or rejection of evidence must be based entirely on its legal quality.

A jury after being out for one day, sent word to the judge that they could not agree. The judge sent back word that he did not believe it yet and added the suggestion that they had better agree that night, as he was going away and should not be back until the second day after and they might not get discharged until he returned. The verdict was returned within an hour afterwards. *Held* that it must be set aside as obtained by duress.

Testimony as to the views of individual jurors is against public policy.

Leave to find a sealed verdict should be granted where there is likely to be prolonged delay after agreement before the verdict can be received.

Intoxication of the testator does not of itself avoid his will if it does not prevent him from knowing what he is about.

The presumption from keeping a will uncancelled is that its execution was not procured against the testator's will or against his intelligent consent, whether fraud, undue influence or the testator's intoxication is alleged against it.

The effect of intoxication upon testamentary capacity is not a question for experts, but depends on common observation and the facts of the particular case.

Where intoxication is alleged as a ground of testamentary incapacity, testimony must be confined to the time involved in the transaction.

Where a will is contested on the ground that it was procured by the undue influence of the testator's wife, his general condition and surroundings and his relations with her may be properly

shown, but only for such a period as can reasonably be regarded as bearing on the act of disposing of his property; and recent facts are more trustworthy than those that are long past.

Ancient scandals concerning a husband's relations with his wife before their marriage are irrelevant to the question of her undue influence as a wife in the making of his will.

A testator is not unduly influenced by his wife unless she defrauds him or exercises such mastery over his will as deprives him of free agency; she has a right to exert any wifely influence over him.

Every one has a right to make his will as he chooses.

If a finding that a will is invalid is based on anything but a conscientious conviction of actual incapacity, shown by the testimony, it is a disgraceful outrage on justice, and a plain violation of the oath under which it is asserted.

Where wills are contested on the ground of testamentary incapacity, courts must exclude all evidence that is merely calculated to rouse prejudice without throwing light on capacity.

Error to Kalamazoo. Submitted January 16. Decided April 2.

ON APPEAL FROM THE PROBATE of the will of Isaac Pierce, the will was held invalid. Proponents bring error.

*Arthur Brown* and *H. F. Severens* for plaintiffs in error. Undue influence, to be ground for setting aside a will, must be shown to have been exercised in every act of its execution, *McMahon v. Ryan*, 20 Penn. St., 329; *Eckert v. Flowry*, 43 Penn. St., 46; *Shailer v. Bumstead*, 99 Mass., 121; *Elliott's Will*, 2 J. J. Marsh., 340; *Jackman's Will*, 26 Wis., 104; Redf. on Wills, 740; *Rutherford v. Morris*, 77 Ill., 413; *Tawney v. Long*, 76 Penn. St., 106; *Rudy v. Ulrich*, 69 Penn. St., 177; affectionate influence is never undue, *Gardiner v. Gardiner*, 34 N. Y., 155; intoxication does not deprive one of the power of making a will unless he is so drunk as not to know what he is about, *Peck v. Cary*, 27 N. Y., 11; Redf. on Wills, 326; *Duffield v. Morris' Ex'r*, 2 Harr. (Del.), 375.

*May, Buck & Powers* and *Edwards & Sherwood* for defendants in error. Proof that husband and wife had lived together in adultery is admissible to show that the

wife had strong influence over the husband, *Dean v. Negley*, 41 Penn. St., 312; *Wallace v. Harris*, 32 Mich., 394: *Kessinger v. Kessinger*, 37 Ind., 341; it is proper for a jury to consider the justice of a will in determining whether it was in fact the testator's, *Clark v. Fisher*, 1 Paige, 171; *Fountain v. Brown*, 38 Ala., 72; 1 Redf. on Wills, 515, 521, 527; a testator's declarations made before the execution of his will and showing that he was subject to undue influence, tend to show undue influence in making the will, *Beaubien v. Cicotte*, 12 Mich., 486; *Harring v. Allen*, 25 Mich., 505; a will made under undue influence cannot be made valid by subsequent recognition, *Lamb v. Girtman*, 26 Ga., 625; any pressure so exerted on the hopes or fears as to overpower volition without convincing the judgment, invalidates a will, *Hall v. Hall*, 37 L. J., 40. Where a will is contested on the ground of incapacity through intoxication, evidence is admissible tending to show for whom the testator had intended his property, *Denison's Appeal*, 29 Conn., 399; *Converse v. Wales*, 4 Allen, 512; *Waterman v. Whitney*, 1 Kern., 157; *Rambler v. Tryon*, 7 S. & R., 90; *Doe v. Hardy*, 1 Moo. & Ry., 525; 1 Redf. on Wills, 542.

CAMPBELL, C. J. The will of Isaac Pierce was admitted to probate December 2d, 1873. It was executed July 29, 1871, and he died July 12, 1873. On appeal by certain of his heirs at law, the will was held invalid. Error is brought against that judgment. The will gave a large portion of the property to his second wife and to her children, who were under age. His children by a former wife, from whom he was divorced, were much older. Two of his sons he made no provision for, saying they had been provided for before. To three others of his older children he devised land, and to a married daughter he made a money bequest. He married his second wife, the plaintiff in error Emeline E. Pierce, in 1855, sixteen years before the date of the will, and eighteen years before his death.

The alleged objections to the will were incapacity generally, and from intoxication and undue influence. There was no evidence of general incapacity, the proof being uncontradicted that he was in his right mind. The only questions worthy of consideration arise out of the admission or ·exclusion of testimony, and rulings upon the other points, and certain complaints of the action of the court.

Before going into the general merits it may be proper to refer to two classes of objections to the rulings and course on the trial. It is claimed that certain rulings of the court were based on an omission of the counsel for plaintiffs in error to frame questions on the suggestion of the judge. It is not desirable that we who were not present at the trial should undertake to pass upon the merits of the occasions which led to some apparent loss of equanimity. But as matter of law, we are of opinion that rulings upon the admission or rejection of testimony must be based entirely on the legal quality of the testimony offered. There is also in several instances what appears to be inconsistency in rulings as to the proper scope of cross-examination. The view which we take of the main questions in the cause renders most of these unimportant. As our own previous decisions have laid down with some fulness the rules applicable to cross-examination, we need not attempt to go over that ground now.

There is also an exception taken to the action of the court concerning the verdict, which is of practical importance. It appears from the facts set out by the judge that the jury retired to their room on Tuesday afternoon. On Wednesday afternoon the officer in charge was requested to inform the judge that they could not agree. Thereupon the judge directed the officer to tell them "The judge does not believe it yet, and you might say to them that it is essential they agree to-night, as

I am going away, and won't be back until day after to-morrow, and they might not get discharged until I come back, as Judge Coolidge is going to be here." The verdict was returned within an hour thereafter. The judge states that at the time one juror, who is named, was the only one holding out, and that he had partly consented, and from his character it was not to be presumed he was influenced by the message.

Inasmuch as it is a very plain violation of public policy to allow any testimony concerning the individual views of jurymen on a case, the question of the propriety of the judge's action cannot be made dependent on any such testimony. If it were, it is enough to say that the juror himself made no statement on the subject, and the oath of three jurors that in their opinion the verdict was not influenced by the message, would be of no account as evidence of that result.

We cannot but think the tendency of the message was to drive the jury into action which might not have been taken otherwise. There is no legal or moral presumption that before a jury has agreed will justify any speculation on the probable result. The one may be right as well as the eleven, and if right, may be able to persuade them. We certainly cannot say that there is anything in the present record which would render such a result impossible. And it is very possible at least not only that a message of the kind here given would be regarded by the outstanding juror as a somewhat strong intimation of the judge's opinion concerning the plainness of the case, and the impropriety of holding out, but also as a very harsh penalty for so doing. It needs no stretch of the imagination to infer what species of treatment a single juror might encounter beyond legitimate argument from associates who were likely to undergo an imprisonment which their agreement would not shorten.

Jury trials can never be safe unless the verdict is made as far as possible the unbiased and free conclu-

sion of every juror. Every attempt to drive men into an agreement which they would not have reached freely, is a perversion of justice. It may be discretionary with the trial judge to keep a jury out until he is satisfied an honest and free agreement is not to be expected. But there is no legal propriety in keeping a jury confined unreasonably after they have come to an agreement, and a verdict obtained by the suggestion of such an alternative is a verdict obtained by what it would be hard to distinguish from duress. It may be that the court is not bound to be present continually on the chances of an agreement; but any unusual and prolonged delay is not to be favored without giving an opportunity to find a sealed verdict.

This error, however innocently committed, as we are bound to suppose it was, must nevertheless, in our opinion, be held fatal to the verdict.

But the principal questions presented will be important on a new trial, and we proceed to consider them.

First, as to the various points bearing on intoxication.

There is no foundation in reason or authority, that we have found, for holding that a will is void for the intoxication of the testator. Intoxication is a term capable of no precise definition, and there may be many degrees of it. If it exists to such an extent as to deprive a testator of the power of controlling his conduct, and knowing what he is about, it will of course have a very evident bearing on his capacity. But if, on the other hand, the act which he does is one which his intoxication does not prevent him from doing with comprehension, it cannot of itself avoid it. It must always be remembered that a will is not usually entirely or chiefly the result of the single interview when it is executed. It has nearly always been planned before and determined on. It does not require a very high degree of mental capacity to carry out a deliberate plan before adopted, and it is not impossible for a person more or

less intoxicated to make a will which is not the product of the intoxication.

And we cannot agree with the circuit judge that the presumption against undue influence from the retention of a will uncancelled by a testator is any more significant than such retention would be in case of intoxication or any other temporary defect. It was held in *White v. Bailey*, 10 Mich., 155, that a finding by a jury that a will was the last will and testament of the decedent, and that at the time of executing it he was of sound disposing mind and memory, and capable of disposing of his property by will, necessarily negatived all undue influence. The statute makes no reference to particular causes of disturbance or incapacity. It lays down a single standard, and all testimony against a will must be aimed at disproving the existence of the statutory capacity. If a person who is capable of knowing what he is about has a will in his possession that he is satisfied with and does not choose to cancel or destroy, the inference that it was not procured to be executed against his will or without his intelligent consent seems to arise as naturally in cases of asserted intoxication as in those of fraud or undue influence, and it would be equally unreasonable in either case to refuse to give it such weight as it naturally calls for.

We are also of opinion that the question of the effect of intoxication upon the capacity of the intoxicated person is not a scientific question to be determined by experts, but one within common observation, depending on the facts of each case, and to be determined from those facts. And we are further of opinion that inasmuch as it is a temporary condition, the testimony must be confined to the time involved in the transaction in controversy. If Pierce was not overcome by drunkenness when he made his will, it is not important what his condition was on other occasions.

Upon the question of undue influence, we have no doubt the general condition and surroundings of the

deceased, and his relations with his wife—who is the only person supposed to have exercised any influence over him—may be properly shown for any period which can reasonably be regarded as bearing on the act of disposal of his property. But as the only important inquiry is concerning the pressure of undue influence at the very time of the will, the testimony to show facts of an inferential nature must be confined to what would be legitimately regarded as his then present relations. No technical nicety as to a few days or perhaps a few weeks can be demanded. But certainly, so far as domestic relations have any pertinency whatever on such questions, it is quite clear that if such influence is to be inferred from them the facts must be more readily shown by recent than by past relations, and the testimony of fresh events is less likely to be manufactured than that of transactions long past.

We think there is very little testimony in the record on this subject which should have been admitted at all. The domestic scandals of many years ago could have no legitimate tendency to prove any modern state of things, and could only serve to burden the case with irrelevant and discreditable details that might and evidently did prejudice the jury, but which had no tendency whatever to show influence in 1871. The law does not confine the power of making wills to persons of blameless character, nor does it disqualify all others from being legatees. And whatever may have been the relations of the testator and his second wife eighteen or nineteen years before his death, and whatever may have been the circumstances of their marriage, it cannot be permissible to draw inferences from them concerning a condition of things many years thereafter, which if existing at all could be proved without difficulty as an existing fact, and not a possible contingency.

With all this irrelevant testimony out of the case, we have found no very tangible evidence upon the subject of undue influence at all, or of any interference by the wife with the husband's actions.

As we had occasion to hold in the recent case of *Latham v. Udell,* ante p. 238, there is no rule which discourages the exercise by a wife of any such wifely influence over a husband as does not indicate that he is incapable of protecting himself adequately from her compulsion, and is practically not a free agent. Unless she either defrauds him or has secured a mastery over his will, which puts him under her control, he cannot be said to have been deprived of his disposing capacity. There is no foundation for any doctrine which would put a wife—no matter of what antecedents—on the footing of an acknowledged mistress. The very existence of marriage relations removes the ordinary occasion for rapacity, as well as the influence which works on the fear of exposure for purposes of extortion. And whether the original relations of the parties were blameless or not, the attempt to go back of many years of marriage for the purpose of raking up some discreditable transactions receives no support in law, for there can be no reasonable inference of future wrong legitimately drawn from it. Neither can it be fairly inferred that the woman was the seducing party. Any inquiry beyond the immediate surroundings of the will and the relations which were near enough in time to throw light upon the subject would be purely conjectural and would, as it did here, fill the record with false issues.

The doctrines applicable to undue influence were so fully discussed in *Wallace v. Harris,* 32 Mich., 380, that there is no occasion to repeat them here. And the rules laid down in *Harring v. Allen,* 25 Mich., 505, excluding the statements of a testator upon the specific fact of undue influence bear very strongly on several items of testimony in the record.

We referred in *Latham v. Udell,* and we think it not improper to refer again to the wrongs done under color of law, by the attempts which are becoming so common as to be dangerous to the security of private property, to overthrow wills because they do not suit the notions of those who determine their validity. The right to

make a will as a testator chooses is as sacred as any other right, and a finding that the will is not valid which is based on any other foundation than a conscientious conviction of actual incapacity shown by the testimony is a disgraceful outrage on justice and a plain violation of the oath under which the conclusion is asserted. It is incumbent on courts to keep out of these cases everything which is merely calculated to create prejudice without throwing light on capacity, and prevent the establishment of fallacious tests which no one would think of acting on in business transactions, to throw doubt on testamentary capacity.

We do not think it necessary to refer to the errors alleged on minor points which, whether well or ill founded, will not probably come up again. The plaintiffs in error were, we think, entitled to some charges which were not supplied by the charge actually given; but the whole theory of the contestants as to the proper range of testimony was so radically wrong that little service would be rendered on a new trial by special references to the charges asked or given on the facts as introduced.

The judgment must be reversed with costs and a new trial granted.

The other Justices concurred.